FILED _____ ENTERED
LOGGED _____ RECEIVED

OCT 3 0 2025

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY
_____ DEPUTY

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | |
| A LARGE APPLE IPHONE IN A BLACK CASE | Case No. 8:25-mj-01000-GLS |
| AN IPHONE 7 IN A BLACK CASE WITH GUCCI TRIM | Case No. 8:25-mj-01001-GLS |
| CURRENTLY LOCATED AT FBI RESIDENT AGENCY, 2400 SCHUSTER DRIVE, HYATTSVILLE, MARYLAND 20781 | |

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR SEARCH WARRANTS

I, Terese Elizabeth Tessari, Special Agent ("SA") with the Federal Bureau of Investigation

("FBI"), being duly sworn, state the following:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for search warrants under Federal

Rule of Criminal Procedure 41 to search the following:

      a.  A large Apple iPhone in a black case, and an iPhone 7 in a black case with

Gucci trim, seized from Kevin Marcel Bushrod during his arrest on July 5, 2024

("**TARGET DEVICES**"), which are currently located at FBI Resident Agency,

2400 Schuster Drive, Hyattsville, Maryland 20781, as further described in

Attachment A-1 and Attachment A-2, respectively, for evidence described in

Attachment B.

2.     This Court has jurisdiction to issue the requested warrants because it is "a court of

1

competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

3.      I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered by law to conduct investigations, to execute search warrants, and to make arrests for violations of Federal law. As a FBI Special Agent, I am authorized to execute warrants issued under the authority of the United States.

4.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since December 5, 2021. I have gone through extensive special agent training at the FBI academy to include how to conduct interviews, the identification and collection of certain evidence, and how to investigate crime. I have specialized training in topics pertaining to law, search and seizure, and criminal law. Prior to attending the FBI academy, I spent approximately four years as a sworn police officer with Prince William County Police Department in Prince William County, Virginia. I also attended six months of training at the Prince William County Criminal Justice Academy. During my time as a law enforcement officer I have made multiple arrests, investigated a multitude of crimes, to include robberies and violent crimes, and had investigations successfully prosecuted in court.

5.      In my capacity as a Special Agent of the FBI, I am authorized to obtain and serve complaints, search, and arrest warrants. Because this Affidavit is being submitted for the limited purpose of establishing probable cause for a criminal complaint, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The

2

information contained in this Affidavit is based upon my knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers and other individuals. The facts set forth in this affidavit are based in part on my observations, my training and experience, and information obtained from other law enforcements officers, agents, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants. It does not set forth all my knowledge, or the knowledge of others, about this matter.

6. Based on my training and experience and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that **KEVIN MARCELL BUSHROD** has committed violations of 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year), 18 U.S.C. §1951 (conspiracy to commit Hobbs Act Robbery), 18 U.S.C. § 1951 (Hobbs Act Robbery), and 18 U.S.C. § 924(c) (using, carrying, and brandishing a firearm during and in relation to a crime of violence) ("TARGET OFFENSES"). There is also probable cause that the records and information associated with the **TARGET DEVICES** will contain evidence, instrumentalities, contraband, or fruits of the TARGET OFFENSES.

7. **BUSHROD** was charged by Complaint on November 21, 2024 (Case No. 24-mj-02851-AAQ) for the commercial armed robberies of Business 1 on June 10, 2024, and robbery of Business 2 on June 13, 2024. On December 5, 2024, a federal grand jury indicted **BUSHROD** with one count of Conspiracy to Commit Hobbs Act Robbery, in violation of 18 U.S.C. § 1951(a), two counts of Hobbs Act Robbery, in violation of 18 U.S.C. § 1951(a), two counts of Use, Carry, and Brandish a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c), and one count of Felon in

3

Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). ECF No. 1.[1] BUSHROD had his initial appearance and arraignment before Chief Magistrate Judge Timothy J. Sullivan on January 29, 2025 in the United States District Court for the District of Maryland. ECF No. 6.

8.     On March 13, 2025, Chief Magistrate Judge Timothy J. Sullivan signed a search warrant that authorized the search of two of **BUSHROD**'s cellular telephones (Case no. 8:25-mj-00590-TJS)[2], and three search warrants that authorized the disclosure of record information related to telephone numbers assigned to **BUSHROD** and his co-conspirator. Case nos. 8:25-mj-00591-TJS; 8:25-mj-00592-TJS; 8:25-mj-00593-TJS. At the time, **BUSHROD**'s cellular telephones were in the custody of Prince George's County Property warehouse. Despite your affiant's good faith efforts to retrieve **BUSHROD**'s cellular telephones before the warrant's March 27, 2025 expiration date, your affiant did not retrieve physical possession of the cellular telephones until April 3, 2025. Your affiant is seeking a warrant so that an examination of the **TARGET DEVICES** will comply with the Fourth Amendment and other applicable laws.

## PROBABLE CAUSE

### *June 10, 2024 Business 1 Robbery*

9.     On Monday, June 10, 2024, at approximately 4:41 a.m., Prince George's County Police Officers responded to Business 1 located at 2309 Chillum Road, Hyattsville, Maryland, 27082, following a report of a commercial armed robbery. Business 1 is a laundromat. At the time, Business 1 conducted business in and affecting interstate commerce in ways including the sale of items produced and manufactured outside the State of

---

[1] The ECF citations throughout refer to the docket for Case No. 8:24-cr-00359-DLB.
[2] Please see incorporated by reference herein as Exhibit 1 (signed warrant and affidavit).

Maryland. For example, Business 1 sells laundry detergent, including Tide products, which are manufactured outside of the state of Maryland. Upon arrival, officers met with the victim employee (Victim 1). Victim 1 advised that at approximately 3:00 a.m., he had opened the door to two subjects—Subject 1 and Subject 2—who were posing as customers. Once inside, Subject 2 displayed a handgun and struck Victim 1 with the weapon causing injuries. Victim 1, fearing for his life, was then forced to open the cashier room, where the subjects stole money from the register. Subsequently, the subjects forced entry into a small office room and stole additional money from the laundry change and money machine. Before fleeing, the subjects also took Victim 1's cell phone and backpack. The subjects stole approximately $4,800 US Currency. Law enforcement believes that the subjects then successfully fled the area in a white Ford Edge bearing Virginia temporary tag "24274K."

10.     During the interview, Victim 1 informed law enforcement that he recognized one of the subjects from an earlier visit. Subject 1 had entered the establishment around midnight, just a few hours before the robbery. During this initial visit, Subject 1 had asked Victim 1 for the key to the bathroom and had left shortly after using the facilities and returning the key.

11.     Investigators reviewed the surveillance footage from and before the robbery incident, which corroborated the victim's account. The footage shows Subject 1 who visited the establishment around midnight to be a black male, approximately 6'4", thin build, with dreadlocks, wearing a black and blue long-sleeve hoodie with "PUMA" written on the chest, light colored jeans and a silver watch. Subject 1 appeared to be surveying the store's interior during this time. The white Ford Edge bearing Virginia temporary tag "24274K" was observed in the parking lot during the subject's initial visit at midnight.

12.     The footage shows that Subject 1 returned accompanied by Subject 2 around

3:00 a.m. to commit the robbery. The footage revealed Subject 2 to be a black male, wearing a black and white hoodie, sunglasses, dark colored pants, black/red Nike Air Jordan IVs and armed with a firearm. According to the video footage, while Subject 2 was with Victim 1 in the cashier room, Subject 1 appeared to be a lookout. Based on my knowledge and experience, usually someone will be a lookout and observe the surrounding area during nefarious acts to decrease the chance of mistakes and avoid law enforcement apprehension.

13.     Following the armed robbery, detectives listed the white Ford Edge bearing Virginia temporary tag "24274K" as a felony vehicle involved in a commercial armed robbery.

### June 13, 2024 Business 2 Robbery

14.     On Thursday, June 13, 2024, at approximately 4:12 a.m., officers responded to Business 2 located at 4501 Silver Hill Road, Suitland, Maryland, 20746, regarding a commercial armed robbery. Business 2 is a laundromat. At the time, Business 2 conducted business in and affecting interstate commerce in ways including the sale of items produced and manufactured outside the State of Maryland. For example, Business 2 sells laundry detergent, including Tide products, which are manufactured outside of the state of Maryland.

15.     Upon arrival, officers met with the victim employee (Victim 2). Victim 2 stated that two subjects—Subject 1 and Subject 2—robbed the establishment. Victim 2 explained that Subject 1 entered the establishment first pretending to be a customer, and then moments later Subject 2 entered the establishment and rushed at Victim 2 while brandishing a firearm. Subject 1 then joined Subject 2, also brandishing a firearm. The subjects demanded that Victim 2 provide them with the keys to the office, but Victim 2

refused. Following Victim 2's refusal, Subject 2 began to pistol-whip Victim 2 in the face and head area, causing several injuries. The subjects then stole the office keys and investigators believe the subjects then fled the location in a white SUV.

16. Investigators reviewed the surveillance footage from the incident, corroborating Victim 2's account. The footage revealed Subject 1 to be a black male, approximately 6'4", skinny, with dreadlocks, wearing a necklace with a peculiar green pendant, a silver watch, and a short-sleeve shirt with visible tattoos. Subject 1 also wore a gun belt with a firearm in a holster and a badge on his waist, resembling the attire of a police officer. Subject 1's firearm had a distinctive brown band on the magazine. Investigators advised that from the footage, Subject 1 drove a white SUV to the location and entered the store pretending to be a customer. Subject 1 was seen talking on the phone inside the establishment, and moments later, Subject 2 was seen exiting the passenger-side area of the white SUV and entering the establishment. Investigators advised the video footage revealed Subject 2 to be a black male, wearing a jean jacket, white T-shirt, dark colored pants, dark shoes, sunglasses, and a wig to disguise his identity.

17. After the subjects stole the establishment's keys from Victim 2, law enforcement believe that the subjects fled the area in the white SUV. Law enforcement believe the white SUV to be the white Ford Edge bearing Virginia temporary tag "24274K" used in the June 10, 2024, commercial armed robbery of Business 1.

### *BUSHROD'S July 5, 2024 Arrest*

18. On July 5, 2024, Fairfax County Auto Crimes investigators observed the white Ford Edge bearing Virginia temporary tag "24274K" in the parking lot of a business in Alexandria, Virginia. Investigators waited for the driver of the vehicle to return. Once the driver of the vehicle returned and entered the driver seat, law enforcement attempted to

conduct a stop. However, the driver of the vehicle fled on foot. The driver was eventually apprehended and identified as **BUSHROD**.



*Above: Images of the Ford Edge (left), **BUSHROD** after he was arrested fleeing from the Ford Edge (middle), and **BUSHROD**'s booking photo (right).*

19.    Further investigation and a side-by-side comparison showed that **BUSHROD**'s physical description was consistent with Subject 1 in the robberies of Business 1 and Business 2. With both robberies, Subject 1 had the same facial features, complexion, beard, dreadlocked hair, a similar silver watch, a height of 6'4, and a thin body build. In addition, the subject is wearing what appears to be the same green pendant necklace in Business 2 and during the time of his arrest. Furthermore, inside of the white Ford Edge bearing Virginia temporary tag "24274K", detectives found a black handgun with a distinctive brown band on the magazine. The recovered firearm appears to be the same firearm seen holstered on Subject 1's waist in the surveillance footage of the Business 2 robbery incident.



*Above: Images from Fairfax Auto Crimes of the white Ford Edge bearing Virginia temporary tag "24274K" (left), and black firearm with a distinctive brown band on the magazine (right).*



*Above: Side-by-side images of Subject 1 on scene of both robberies, Business 1 (left) and Business 2 (middle and top right); arrest photo of BUSHROD (bottom right)*

20.     During **BUSHROD**'s arrest, law enforcement recovered a stolen Spring Field armory .45 caliber semi-automatic handgun with serial number US685526 and a distinctive brown band on the magazine ("the firearm"). Law enforcement officers tested the firearm and found it to be functional. Investigators swabbed the aforementioned firearm for the possible presence of DNA on the weapon.

21.     Investigators conducted a Maryland Department of Transportation Motor Vehicle Administration registration check on the Ford Edge's Virginia temporary tag "24274K" which returned to a 2021 Audi vehicle. Investigators also conducted a Vehicle Identification Number check which confirmed that the vehicle was a 2016 white Ford Edge that was reported stolen through Montgomery County, Maryland on April 16, 2024.

22.     Investigators also seized a large Apple iPhone cell phone in a black case, and

an iPhone 7 in a black case with Gucci trim (**TARGET DEVICES**). The **TARGET DEVICES** were taken into custody by Detective Gukas with Prince George's County Police and transported to Prince George's County Property Warehouse, 1739 Brightseat Road, Hyattsville, MD 20785.[3]

23.     During his arrest, **BUSHROD** gave the phone number of 703-930-2100 to law enforcement. This phone number coincides with the iPhone 7 in a black case with Gucci trim. Furthermore, Detective Gukas with Prince George's County Police Department used the emergency function on the large Apple iPhone in a black case to dial 911. The phone number for this device was determined to be 771-216-6277. After investigators received a search warrant for the phone downloads of these two phones, the phone numbers were able to be confirmed by law enforcement as phones used by **BUSHROD.**

24.     From my training and experience, I know that the **TARGET DEVICES** were stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **TARGET DEVICES** first came into the possession of Prince George's County Police Department. The devices are currently located at FBI Resident Agency, 2400 Schuster Drive, Hyattsville, Maryland 20781. In my training and experience, I know that the **TARGET DEVICES** have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **TARGET DEVICES** first came into the possession of the Prince George's County Police Department.

---

[3] On July 9, 2024, Detective Gukas obtained search warrants for the Target Devices signed by Judge Gladys M. Weatherspoon of the Circuit Court for Prince George's County, Maryland. I believe that these search warrants were in all respects proper, but am submitting the proposed federal search warrants for the Target Devices in conjunction with this federal investigation concerning violations of federal law.

## TECHNICAL TERMS

25.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a

mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Service Providers: Companies that provide cellular communications service to the general public, and as such is a provider of an electronic communication service, as defined in 18 U.S.C. § 2510(15).

26. Based on my training, experience, and research, I believe that the **TARGET DEVICES** have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the devices. This information can sometimes be recovered with forensics tools.

28. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence

of the crimes described on the warrants, but also forensic evidence that establishes how the **TARGET DEVICES** were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **TARGET DEVICES** because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants that I am applying for would permit the examination of the devices consistent with the warrants. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrants.

30. *Manner of execution.* Because the warrants seeks only permission to examine devices already in law enforcement's possession, the execution of the warrants does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrants at any time in the day or night.

## CONCLUSION

31. Based on the foregoing, there is probable cause for this Court to issue the requested warrants.

*Terese Elizabeth Tessari*

Terese Elizabeth Tessari, Special Agent
Federal Bureau of Investigation


Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) on this ___16th___ day of April, 2025.

_____
THE HONORABLE GINA L. SIMMS
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

### Property to Be Searched

The property to be searched is a large Apple iPhone cell phone in a black case seized from **BUSHROD** ("**TARGET DEVICES**"), during his arrest on July 5, 2024, which is currently located at FBI Resident Agency, 2400 Schuster Drive, Hyattsville, Maryland 20781.

This warrant authorizes the forensic examination of the **TARGET DEVICES** for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT A-2**

**Property to Be Searched**

The property to be searched is an iPhone 7 in a black case with Gucci trim, seized from **BUSHROD ("TARGET DEVICES")**, during his arrest on July 5, 2024, which is currently located at FBI Resident Agency, 2400 Schuster Drive, Hyattsville, Maryland 20781.

This warrant authorizes the forensic examination of the **TARGET DEVICES** for the purpose of identifying the electronically stored information described in Attachment B.

**<u>ATTACHMENT B</u>**

**Particular Things to be Seized**

All records, documents, items, data, and other information that may constitute fruits or instrumentalities of, or contain evidence related to, violations of 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year), 18 U.S.C. §1951 (Conspiracy to Commit Hobbs Act Robbery), §1951 (Hobbs Act Robbery), and 18 U.S.C. § 924(c) (using, carrying, and brandishing a firearm during and in relation to a crime of violence) ("TARGET OFFENSES"), including, but not limited to, the following that may be found in the **TARGET DEVICES** described in Attachment A-1 and A-2:

1.      Any and all images, videos, notes, documents, records, or correspondence pertaining to the Target Offenses.

2.      Your Affiant seeks the authority to complete a forensic duplication of the electronic contents of this device in search of:

     a.  Available call logs, including dates, times, durations, directionality, and originating and terminating phone numbers for data during the time period of June 1, 2024, through and including July 5, 2024, demonstrating knowledge of the specific incident or communication with co-conspirators in the robberies.

     b.  Available contact information for data during the time period of June 1, 2024, through and including July 5, 2024, demonstrating knowledge of the specific incident or communication with co-conspirators in the robberies.

     c.  Available SMS and MMS messages to include pictures and videos contained therein for data during the time period of June 1, 2024, through and including July 5, 2024, demonstrating knowledge of the specific incident or communication with co-conspirators in the robberies.

     d.  All Available digital media such as photographs, or videos generated or stored on the device during the time period of June 1, 2024, through and including July 5, 2024, demonstrating knowledge of the specific incident or communication with co-conspirators in the robberies.

e. Available application and usage data, during the time period of June 1, 2024, through and including July 5, 2024, to include messages sent and received utilizing third party and internet-based applications demonstrating knowledge of the specific incident or communication with co-conspirators in the robberies.

f. Available cell site and sector activation and GPS/GEO locate information for data from June 1, 2024, through and including July 5, 2024, demonstrating knowledge of the specific incident or communication with co-conspirators in the robberies.

g. Any personal contacts or notes for data from June 1, 2024, through and including July 5, 2024, demonstrating knowledge of the specific incident or communication with co-conspirators in the robberies.

h. Logs of any internet activity associated with this device including web searches, downloads, or on-line communications for data from June 1, 2024, through and including July 5, 2024, demonstrating knowledge of the specific incident or communication with co-conspirators in the robberies.

i. Available device and user identifying information including, but not limited to, Electronic Serial Number (ESN), International Mobile Equipment Identifier (IMEI), MAC address, Bluetooth Address, user imported or supplied identifiers such as device names, usernames, email, or iCloud addresses from June 1, 2024, through and including July 5, 2024.

j. Available embedded SIM card data such as mobile service provider name, assigned telephone number(s), and device functionality data stored within the SIM card from June 1, 2024, through and including July 5, 2024.

3. Evidence of who used, owned, or controlled the **TARGET DEVICES** described in Attachment A-1 and A-2 at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, "chat," instant messaging logs, photographs, and correspondence;

a. evidence of software that would allow others to control the **TARGET DEVICES** described in Attachment A-1 and A-2, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

b. evidence of the lack of such malicious software;

c. evidence of the attachment to the **TARGET DEVICES** described in Attachment A-1 and A-2 of other storage devices or similar containers for electronic evidence;

d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the **TARGET DEVICES** described in Attachment A-1 and A-2;

e. evidence of the times the **TARGET DEVICES** described in Attachment A-1 and A-2 was used;

f. passwords, encryption keys, and other access devices that may be necessary to access the **TARGET DEVICES** described in Attachment A-1 and A-2;

g. documentation and manuals that may be necessary to access the **TARGET DEVICES** described in Attachment A-1 and A-2 or to conduct a forensic examination of each device described in Attachment A-1 and A-2; and

h. contextual information necessary to understand the evidence described in this attachment.

4. As used above, the terms "records, documents, messages, correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials, created, modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

5. With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software, or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

a. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

b. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

c. "scanning" storage areas to discover and possible recover recently deleted files;

d. "scanning" storage areas for deliberately hidden files; or

e. performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

6. If after performing these procedures, the directories, files, or storage areas do not reveal evidence of child pornography or other criminal activity, the further search of that particular directory, file, or storage area shall cease.

7. With respect to the search of the information seized pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the Court. The investigative team may continue to review any information not segregated as potentially privileged.

# Exhibit 1

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means      ☑ Original      ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Maryland

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>A LARGE APPLE IPHONE IN A BLACK CASE AND AN IPHONE 7<br>IN A BLACK CASE WITH GUCCI TRIM CURRENTLY LOCATED<br>AT PRINCE GEORGE'S COUNTY PROPERTY WAREHOUSE,<br>1739 BRIGHTSEAT ROAD, HYATTSVILLE MD 20785 | )<br>)<br>)<br>)    Case No.    8:25-mj-00590-TJS<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ **Maryland** .
*(identify the person or describe the property to be searched and give its location)*:

.See Attachment A-1.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B-1.

**YOU ARE COMMANDED** to execute this warrant on or before   March 27, 2025 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Duty Magistrate Judge _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
    ☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    March 13, 2025 at 11:46 a.m. _____      *(signature)*
                                                   *Judge's signature*

City and state:    Greenbelt, Maryland _____      Honorable Timothy J. Sullivan, Chief Magistrate Judge
                                                                *Printed name and title*

## Return

| Case No.:<br>8:25-mj-00590-TJS | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned electronically along with the warrant to the designated judge pursuant to Fed. R. Crim. P. 4.1 and 41(f)(1)(D).

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:** | |
| **A LARGE APPLE IPHONE IN A BLACK CASE** | |
| **AN IPHONE 7 IN A BLACK CASE WITH GUCCI TRIM** | Case No. 8:25-mj-00590-TJS |
| **CURRENTLY LOCATED AT PRINCE GEORGE'S COUNTY PROPERTY WAREHOUSE, 1739 BRIGHTSEAT ROAD, HYATTSVILLE MD 20785** | |
| **INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER 771-216-6277 THAT IS STORED AT PREMISES CONTROLLED BY VERIZON** | Case No. 8:25-mj-00591-TJS |
| **INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER 703-930-2100 THAT IS STORED AT PREMISES CONTROLLED BY T-MOBILE** | Case No. 8:25-mj-00592-TJS |
| **INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER 202-802-8212 THAT IS STORED AT PREMISES CONTROLLED BY AT&T** | Case No. 8:25-mj-00593-TJS |
| **THE CHEEK CELLS/SALIVA (BUCCAL SWAB) OF KEVIN MARCELL BUSHROD** | Case No. 8:25-mj-00594-TJS |
| | **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR SEARCH WARRANTS

I, Terese Elizabeth Tessari, Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), being duly sworn, state the following:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for search warrants under Federal Rule of Criminal Procedure 41 to search the following:

  a. A large Apple iPhone in a black case, and an iPhone 7 in a black case with Gucci trim, seized from Kevin Marcel Bushrod during his arrest on July 5, 2024 ("**TARGET DEVICES**"), which are currently located at Prince George's County Property Warehouse, 1739 Brightseat Road, Hyattsville, MD 20785, as further described in Attachment A-1, for evidence described in Attachment B-

  b. Receipt of information pertaining to the location of cellular telephones assigned the numbers of **703-930-2100** and **771-216-6277** (**SUBJECT 1 TELEPHONES**) which are believed to be used by Kevin Marcell **BUSHROD**, with service provided by T-Mobile and Verizon (**SERVICE PROVIDERS**) at 4 Sylvan Way, Parsippany, New Jersey, 07054 and One Verizon Way, Basking Ridge, New Jersey 07920, respectively, as further described in Attachments A-2 and A-3, for the evidence described in Attachment B-2.

  c. Receipt of information pertaining to the location of cellular telephone assigned the number of **202-802-8212 (SUBJECT 2 TELEPHONE)** believed to be used by Don Diego CHASE, with service provided by AT&T at 208 S Akard St, Dallas, TX 75201, as further described in Attachment A-4, for the evidence described in Attachment B-2.

2

d. A sample of deoxyribonucleic acid ("DNA") of the person, **KEVIN MARCELL BUSHROD**, further identified in Attachment A-5, to be collected via buccal swab in accordance with established procedures, and to be analyzed forensically in accordance with the applicable, valid established procedures, as described in Attachment B-3.

2.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

3.     I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered by law to conduct investigations, to execute search warrants, and to make arrests for violations of Federal law. As a FBI Special Agent, I am authorized to execute warrants issued under the authority of the United States.

4.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since December 5, 2021. I have gone through extensive special agent training at the FBI academy to include how to conduct interviews, the identification and collection of certain evidence, and how to investigate crime. I have specialized training in topics pertaining to law, search and seizure, and criminal law. Prior to attending the FBI academy, I spent approximately four years as a sworn police officer with Prince William County Police Department in Prince William County, Virginia. I also attended six months of training at the Prince William County Criminal Justice Academy. During my time as a law enforcement officer I have made multiple arrests, investigated a multitude of crimes, to include robberies and violent crimes, and had investigations successfully prosecuted in court.

5.     In my capacity as a Special Agent of the FBI, I am authorized to obtain and serve complaints, search, and arrest warrants. Because this Affidavit is being submitted for the limited purpose of establishing probable cause for a criminal complaint, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The information contained in this Affidavit is based upon my knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers and other individuals. The facts set forth in this affidavit are based in part on my observations, my training and experience, and information obtained from other law enforcements officers, agents, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all my knowledge, or the knowledge of others, about this matter.

6.     Based on my training and experience and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that **KEVIN MARCELL BUSHROD** and Don Diego CHASE have committed violations of 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year), 18 U.S.C. §1951(a) (conspiracy to commit Hobbs Act Robbery), 18 U.S.C. § 1951(a) (Hobbs Act Robbery), and 18 U.S.C. § 924(c) (Using, Carrying, and Brandishing a Firearm During and in Relation to a Crime of Violence) ("TARGET OFFENSES"). There is also probable cause that the records and information associated with the TARGET DEVICES, SUBJECT 1 TELEPHONES, SUBJECT 2 TELEPHONE, and **BUSHROD**'s DNA will contain evidence, instrumentalities, contraband, or fruits of the TARGET OFFENSES.

4

**PROBABLE CAUSE**

*June 10, 2024 Business 1 Robbery*

7.      On Monday, June 10, 2024, at approximately 4:41 a.m., Prince George's County Police Officers responded to Business 1 located at 2309 Chillum Road, Hyattsville, Maryland, 27082, following a report of a commercial armed robbery. Business 1 is a laundromat. At the time, Business 1 conducted business in and affecting interstate commerce in ways including the sale of items produced and manufactured outside the State of Maryland. For example, Business 1 sells laundry detergent, including Tide products, which are manufactured outside of the state of Maryland. Upon arrival, officers met with the victim employee (Victim 1). Victim 1 advised that at approximately 3:00 a.m., he had opened the door to two subjects – Subject 1 and Subject 2 – who were posing as customers. Once inside, Subject 2 displayed a handgun and struck Victim 1 with the weapon causing injuries. Victim 1, fearing for his life, was then forced to open the cashier room, where the subjects stole money from the register. Subsequently, the subjects forced entry into a small office room and stole additional money from the laundry change and money machine. Before fleeing, the subjects also took Victim 1's cell phone and backpack. The subjects stole approximately $4,800 US Currency. Law enforcement believes that the subjects then successfully fled the area in a white Ford Edge bearing Virginia temporary tag "24274K."

8.      During the interview, Victim 1 informed law enforcement that he recognized one of the subjects from an earlier visit. Subject 1 had entered the establishment around midnight, just a few hours before the robbery. During this initial visit, Subject 1 had asked Victim 1 for the key to the bathroom and had left shortly after using the facilities and returning the key.

9.      Investigators reviewed the surveillance footage from and before the robbery

incident, which corroborated the victim's account. The footage shows Subject 1 who visited the establishment around midnight to be a black male, approximately 6'4", thin build, with dreadlocks, wearing a black and blue long-sleeve hoodie with "PUMA" written on the chest, light colored jeans and a silver watch. Subject 1 appeared to be surveying the store's interior during this time. The white Ford Edge bearing Virginia temporary tag "24274K" was observed in the parking lot during the subject's initial visit at midnight.

10.     The footage shows that Subject 1 returned accompanied by Subject 2 around 3:00 a.m. to commit the robbery. The footage revealed Subject 2 to be a black male, wearing a black and white hoodie, sunglasses, dark colored pants, black/red Nike Air Jordan IVs and armed with a firearm. According to the video footage, while Subject 2 was with Victim 1 in the cashier room, Subject 1 appeared to be a lookout. Based on my knowledge and experience, usually someone will be a lookout and observe the surrounding area during nefarious acts to decrease the chance of mistakes and avoid law enforcement apprehension.

11.     Following the armed robbery, detectives listed the white Ford Edge bearing Virginia temporary tag "24274K" as a felony vehicle involved in a commercial armed robbery.

### June 13, 2024 Business 2 Robbery

12.     On Thursday, June 13, 2024, at approximately 4:12 a.m., officers responded to Business 2 located at 4501 Silver Hill Road, Suitland, Maryland, 20746, regarding a commercial armed robbery. Business 2 is a laundromat. At the time, Business 2 conducted business in and affecting interstate commerce in ways including the sale of items produced and manufactured outside the State of Maryland. For example, Business 2 sells laundry detergent, including Tide products, which are manufactured outside of the state of

Maryland.

13.     Upon arrival, officers met with the victim employee (Victim 2). Victim 2 stated that two subjects – Subject 1 and Subject 2 – robbed the establishment. Victim 2 explained that Subject 1 entered the establishment first pretending to be a customer, and then moments later Subject 2 entered the establishment and rushed at Victim 2 while brandishing a firearm. Subject 1 then joined Subject 2, also brandishing a firearm. The subjects demanded that Victim 2 provide them with the keys to the office, but Victim 2 refused. Following Victim 2's refusal, Subject 2 began to pistol-whip Victim 2 in the face and head area, causing several injuries. The subjects then stole the office keys and investigators believe the subjects then fled the location in a white SUV.

14.     Investigators reviewed the surveillance footage from the incident, corroborating Victim 2's account. The footage revealed Subject 1 to be a black male, approximately 6'4", skinny, with dreadlocks, wearing a necklace with a peculiar green pendant, a silver watch, and a short- sleeve shirt with visible tattoos. Subject 1 also wore a gun belt with a firearm in a holster and a badge on his waist, resembling the attire of a police officer. Subject 1's firearm had a distinctive brown band on the magazine. Investigators advised that from the footage, Subject 1 drove a white SUV to the location and entered the store pretending to be a customer. Subject 1 was seen talking on the phone inside the establishment, and moments later, Subject 2 was seen exiting the passenger-side area of the white SUV and entering the establishment. Investigators advised the video footage revealed Subject 2 to be a black male, wearing a jean jacket, white T-shirt, dark colored pants, dark shoes, sunglasses, and a wig to disguise his identity.

15.     After the subjects stole the establishment's keys from Victim 2, law

enforcement believe that the subjects fled the area in the white SUV. Law enforcement believe the white SUV to be the white Ford Edge bearing Virginia temporary tag "24274K" used in the June 10, 2024, commercial armed robbery of Business 1.

### *BUSHROD'S July 5, 2024 Arrest*

16. On July 5, 2024, Fairfax County Auto Crimes investigators observed the white Ford Edge bearing Virginia temporary tag "24274K" in the parking lot of a business in Alexandria, Virginia. Investigators waited for the driver of the vehicle to return. Once the driver of the vehicle returned and entered the driver seat, law enforcement attempted to conduct a stop. However, the driver of the vehicle fled on foot. The driver was eventually apprehended and identified as **BUSHROD**.



*Above: Images of the Ford Edge (left), **BUSHROD** after he was arrested fleeing from the Ford Edge (middle), and **BUSHROD**'s booking photo (right).*

17. Further investigation and a side-by-side comparison showed that **BUSHROD**'s physical description was consistent with Subject 1 in the robberies of Business 1 and Business 2. With both robberies, Subject 1 had the same facial features, complexion, beard, dreadlocked hair, a similar silver watch, a height of

6'4, and a thin body build. In addition, the subject is wearing what appears to be the same green pendant necklace in Business 2 and during the time of his arrest. Furthermore, inside of the white Ford Edge bearing Virginia temporary tag "24274K", detectives found a black handgun with a distinctive brown band on the magazine. The recovered firearm appears to be the same firearm seen holstered on Subject 1's waist in the surveillance footage of the Business 2 robbery incident.

 

*Above: Images from Fairfax Auto Crimes of the white Ford Edge bearing Virginia temporary tag "24274K" (left), and black firearm with a distinctive brown band on the magazine (right).*



*Above: Side-by-side images of Subject 1 on scene of both robberies, Business 1 (left) and Business 2 (middle and top right); arrest photo of BUSHROD (bottom right)*

21.     During **BUSHROD**'s arrest, law enforcement recovered a stolen Spring Field armory .45 caliber semi-automatic handgun with serial number US685526 and a distinctive brown band on the magazine ("the firearm"). Law enforcement officers tested the firearm and found it to be functional. Investigators swabbed the aforementioned firearm for the possible presence of DNA on the weapon.

22.     Investigators conducted a Maryland Department of Transportation Motor Vehicle Administration registration check on the Ford Edge's Virginia temporary tag "24274K" which returned to a 2021 Audi vehicle. Investigators also conducted a Vehicle Identification Number check which confirmed that the vehicle was a 2016 white Ford Edge that was reported stolen through Montgomery County, Maryland on April 16, 2024.

23.     Investigators also seized a large Apple iPhone cell phone in a black case, and an iPhone 7 in a black case with Gucci trim (TARGET DEVICES). The TARGET

DEVICES were taken into custody by Detective Gukas with Prince George's County Police and transported to Prince George's County Property Warehouse, 1739 Brightseat Road, Hyattsville, MD 20785.[1]

24.     During his arrest, **BUSHROD** gave the phone number of 703-930-2100 to law enforcement. This phone number coincides with the iPhone 7 in a black case with Gucci trim. Furthermore, Detective Gukas with Prince George's County Police Department used the emergency function on the large Apple iPhone in a black case to dial 911. The phone number for this device was determined to be 771-216-6277. After investigators received a search warrant for the phone downloads of these two phones, the phone numbers were able to be confirmed by law enforcement as phones used by **BUSHROD.**

25.     The phone number 202-802-8212 was made known to law enforcement after a search warrant was conducted on SUBJECT 1 TELEPHONE. The phone number 202-802-8212 appears to be a phone number used by **CHASE**—the co-conspirator involved in the TARGET OFFENSES. On or about July 3, 2024, Detective Geiger from the Metropolitan Police Department obtained subscriber information, historical data, and pings on the SUBJECT 2 TELEPHONE from the telephone provider AT&T through a search warrant. The subscriber records indicated that the 202-802-8212 phone number is registered to Alexis Taylor, who has been identified as **CHASE**'s girlfriend through police incident reports. There are a number of text messages sent from SUBJECT 2 TELEPHONE and received by SUBJECT 1 TELEPHONE 703-930-2100. The text messages can be read in order of time sent from the bottom up. On June 13, 2024 at 1:58 a.m., prior to the robbery

---

[1] On July 9, 2024, Detective Gukas obtained search warrants for the Target Devices signed by Judge Gladys M. Weatherspoon of the Circuit Court for Prince George's County, Maryland. I believe that these search warrants were in all respects proper, but am submitting the proposed federal search warrants for the Target Devices in conjunction with this federal investigation concerning violations of federal law.

of Business 2, a text message is sent from SUBJECT 1 TELEPHONE to SUBJECT 2 TELEPHONE that reads, "He cake". Another message is sent directly after at 1:58 a.m., "He alone it's one dude here fuk him". On June 17, 2024 at 2:21 p.m. SUBJECT 2 TELEPHONE sends a text message to SUBJECT 1 TELEPHONE that says, "We on news" and also at 2:21 p.m. "And that truck hot they on it". At 2:21 p.m. SUBJECT 1 TELEPHONE replies, "lol". At 2:21 p.m. SUBJECT 2 TELEPHONE replies, "Fox5".[2]



---

[2] There were news media reports on two suspects committing laundromat robberies in Prince George's County around the time that SUBJECT 1 and SUBJECT 2 were sending and receiving text messages before and during the Business 2 robbery. *See* https://wjla.com/news/crime/prince-georges-county-laundromat-robberies-suspects-wanted-police-department-reward-offered-victim-injured-arrest-information-dmv-investigation-maryland-crime.

**+12028028212**
2:21 PM, 6/17/2024

And that truck hot they on it

**+12028028212**
2:21 PM, 6/17/2024

We on news

1:58 AM, 6/13/2024

He alone it's one dude here fuk him

1:58 AM, 6/13/2024

He cake

26.     There are also call detail records ("CDR") from the SUBJECT 2 TELEPHONE that places the phone in close proximity to the June 10, 2024 and June 13, 2024 robberies. The records were reviewed by Tactical Specialist Helgeson who advised your affiant that the records indicate that SUBJECT 2 TELEPHONE was in the area of Business 1 on June 9, 2024 at approximately 11:44p.m. and again on June 10, 2024 at approximately 2:50 a.m. SUBJECT 2 TELEPHONE had 33 data events when it was in the area of Business 1 at approximately 2:50 a.m. on June 10, 2024.

27.     The CDR indicates that SUBJECT 2 TELEPHONE was in the area of Business 2 on June 13, 2024 at approximately 2:59 a.m. for approximately 10 minutes before leaving. SUBJECT 2 TELEPHONE then returned to the area of Business 2 at 3:50 a.m. and made a couple of outgoing phone calls.

13

28. From my training and experience, I know that the TARGET DEVICES were stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the TARGET DEVICES first came into the possession of Prince George's County Police Department. The devices are currently located at Prince George's County Property Warehouse, 1739 Brightseat Road, Hyattsville, MD 20785.

29. **BUSHROD** was charged by Complaint on November 21, 2024 (Case No. 24-mj-02851-AAQ) for the commercial armed robberies of Business 1 on June 10, 2024 robbery and Business 2 on June 13, 2024. On December 5, 2024, a federal grand jury indicted **BUSHROD** with one count of Conspiracy to commit Hobbs Act Robbery, in violation of 18 U.S.C. § 1951(a), two counts of Hobbs Act Robbery, in violation of 18 U.S.C. § 1951(a), two counts of Use, Carry, and Brandish a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c), and one count of Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1). ECF No. 1. **BUSHROD** had his initial appearance and arraignment before Chief Magistrate Judge Timothy J. Sullivan on January 29, 2025. ECF No. 6.

### Target Devices

30. As further explained above, law enforcement recovered the TARGET DEVICES from BUSHROD during his arrest in Fairfax, Virginia on July 5, 2024. Based on my training and experience, individuals will use cellular devices to facilitate the commission of commercial armed robberies by communicating with co-conspirators to plan and execute the crime. Based on the facts and information contained in this affidavit, there is probable cause to believe that BUSHROD had possession of the TARGET

14

DEVICES during the time period of the June 10, 2024 and June 13, 2024 robberies.

### *Subject Telephones*

31.     As described above, SUBJECT 1 TELEPHONE, specifically the 703-930-2100 phone number, communicated with SUBJECT 2 TELEPHONE on the day of the Business 2 robbery on June 13, 2024. There were additional communications between SUBJECT 1 TELEPHONE and SUBJECT 2 TELEPHONE that referenced their criminal activity being reported on the news.

### *BUSHROD's DNA*

32.     As discussed above, there is reason to believe that **BUSHROD** possessed the stolen Spring Field armory .45 caliber semi-automatic handgun with serial number US685526 during the June 13, 2024 commercial armed robbery at Business 2 and during his arrest on July 5, 2024. The Government seeks to obtain a DNA sample from **BUSHROD** to compare **BUSHROD**'s DNA from the sample recovered from the firearm on July 5, 2024. There is probable cause to believe that this information will confirm that **BUSHROD** did use this firearm to commit the TARGET OFFENSES.

### **TECHNICAL TERMS**

33.     Based on my training and experience, I use the following technical terms to convey the following meanings:

  a.  Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and

moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA

16

users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Service Providers: Companies that provide cellular communications service to the general public, and as such is a provider of an electronic communication service, as defined in 18 U.S.C. § 2510(15).

34. Based on my training, experience, and research, I believe that the TARGET DEVICES have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

35. Based on my training and experience, I have learned that SERVICE PROVIDERS have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

36. Based on my training and experience, I know that the SERVICE PROVIDERS can collect cell-site data on a prospective basis about the SUBJECT 1 TELEPHONES and SUBJECT 2 TELEPHONE. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the

17

customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as SERVICE PROVIDERS typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

37. Based on my training and experience, I know that certain SERVICE PROVIDERS can collect per-call measurement data, which is referred to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

38. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers—as transmitted from a cellular device to a cellular antenna or tower—can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

39. Based on my training and experience, I know that wireless providers such as SERVICE PROVIDERS typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the

subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as SERVICE PROVIDERS typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT 1 TELEPHONE and SUBJECT 2 TELEPHONE's user or users and may assist in the identification of co-conspirators and/or victims.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

40.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

41.     *Forensic evidence.* As further described in Attachment B-1, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET DEVICES were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the TARGET DEVICES because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

42. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

43. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## DNA EVIDENCE COLLECTION

44. Your Affiant knows from experience and training that DNA is found in human tissue and provides a genetic "blueprint" for each person. Thus, DNA is unique to each person with the exception of identical twins, and it has accordingly been used by forensic scientists in a manner similar to fingerprints, that is, to identify persons who have left their DNA behind at crime scenes or on items of evidence. DNA evidence is potentially extremely accurate as a

means of identifying individuals. DNA can be found in any number of bodily tissues, including blood, hair, bone, and saliva. Accordingly, a DNA sample suitable for comparison may be obtained by swabbing the inside of a person's mouth, commonly known as a "buccal swab." Buccal samples are obtained by asking the subject to open their mouth, whereupon a law enforcement officer (or the subject upon request of the law enforcement officer) inserts a sterile, elongated "Q-tip" into the subject's mouth, which is then rubbed vigorously along the inside of the subject's cheeks and elsewhere inside the mouth.

45.     Law enforcement now seeks to obtain a buccal swab from **BUSHROD** to compare his DNA to any interpretable/usable DNA profile found on any recovered physical evidence, such as the recovered Spring Field armory .45 caliber semi-automatic firearm bearing serial number US685526. A match between, inclusion of, or exclusion of **BUSHROD's** DNA and DNA on the evidence of the recovered firearm would make a fact of consequence more or less probable.

## CONCLUSION

46.     Based on the foregoing, there is probable cause for this Court to issue the requested warrant.

*Terese Elizabeth Tessari*
Terese Elizabeth Tessari, Special Agent
Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) on this 13th day of March 2025.

THE HONORABLE TIMOTHY J. SULLIVAN
UNITED STATES CHIEF MAGISTRATE JUDGE

## ATTACHMENT A-1

### Property to Be Searched

The property to be searched is a large Apple iPhone cell phone in a black case, and an iPhone 7 in a black case with Gucci trim, seized from **BUSHROD** ("**TARGET DEVICES**"), during his arrest on July 5, 2024, which are currently located at Prince George's County Property Warehouse, 1739 Brightseat Road, Hyattsville, MD 20785.

This warrant authorizes the forensic examination of the **TARGET DEVICES** for the purpose of identifying the electronically stored information described in Attachment B-1.

## ATTACHMENT A-2

### Property to be Searched

This warrant applies to records and information associated with the cellular numbers assigned **703-930-2100 (SUBJECT 1 TELEPHONE)** which is believed to be used by Kevin Marcell **BUSHROD**, with service provided by T-Mobile **(SERVICE PROVIDER)** headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054.

## ATTACHMENT A-3

### Property to be Searched

This warrant applies to records and information associated with the cellular numbers assigned **771-216-6277 (SUBJECT 1 TELEPHONE)** which is believed to be used by Kevin Marcell **BUSHROD**, with service provided by Verizon (**SERVICE PROVIDER**) which is headquartered a 180 Washington Valley Road, Bedminster, NJ, 07921.

## ATTACHMENT A-4

### Property to be Searched

This warrant applies to records and information associated with the cellular numbers assigned **202-802-8212 (SUBJECT 2 TELEPHONE)** which is believed to be used by Don Diego **CHASE,** with service provided by AT&T headquartered at 11760 US HWY 1, Suite 300, North Palm Beach, Florida. .

## ATTACHMENT A-5

### Person to be Searched

The person to be searched is **KEVIN MARCELL BUSHROD**. His date of birth is December 16, 1986. He is presently in Virginia in the custody of law enforcement. Mr. Bushrod is pictured below:



**Particular Things to be Seized**

All records, documents, items, data, and other information that may constitute fruits or instrumentalities of, or contain evidence related to, violations of 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year), 18 U.S.C. §1951(a) (Conspiracy to Commit Hobbs Act Robbery), §1951(a) (Hobbs Act Robbery), and 18 U.S.C. § 924(c) (Using, Carrying, and Brandishing a Firearm During and in Relation to a Crime of Violence) ("**TARGET OFFENSES**"), including, but not limited to, the following that may be found in the **TARGET DEVICES** described in Attachment A-1:

1.    Any and all images, videos, notes, documents, records, or correspondence pertaining to the Target Offenses.

2.    Your Affiant seeks the authority to complete a forensic duplication of the electronic contents of this device in search of:

    a.  Available call logs, including dates, times, durations, directionality, and originating and terminating phone numbers for data demonstrating knowledge of the specific incident or communication with co-conspirators in the robberies.

    b.  Available contact information for data demonstrating knowledge of the specific incident or communication with co-conspirators in the robberies.

    c.  Available SMS and MMS messages to include pictures and videos contained therein for data demonstrating knowledge of the specific incident or communication with co-conspirators in the robberies.

    d.  All Available digital media such as photographs, or videos generated or stored on the device demonstrating knowledge of the specific incident or communication with co-conspirators in the robberies.

    e.  Available application and usage data, to include messages sent and received utilizing third party and internet-based applications demonstrating knowledge of the specific incident or communication with co-conspirators in the robberies.

f.  Available cell site and sector activation and GPS/GEO locate information for data demonstrating knowledge of the specific incident or communication with co-conspirators in the robberies.

g.  Any personal contacts or notes for data demonstrating knowledge of the specific incident or communication with co-conspirators in the robberies.

h.  Logs of any internet activity associated with this device including web searches, downloads, or on-line communications for data demonstrating knowledge of the specific incident or communication with co-conspirators in the robberies.

i.  Available device and user identifying information including, but not limited to, Electronic Serial Number (ESN), International Mobile Equipment Identifier (IMEI), MAC address, Bluetooth Address, user imported or supplied identifiers such as device names, usernames, email, or iCloud addresses.

j.  Available embedded SIM card data such as mobile service provider name, assigned telephone number(s), and device functionality data stored within the SIM card.

3.  Evidence of who used, owned, or controlled the **TARGET DEVICES** described in Attachment A-1 at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, "chat," instant messaging logs, photographs, and correspondence;

a.  evidence of software that would allow others to control the **TARGET DEVICES** described in Attachment A-1, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

b.  evidence of the lack of such malicious software;

c.  evidence of the attachment to the **TARGET DEVICES** described in Attachment A-1 of other storage devices or similar containers for electronic evidence;

d.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the **TARGET DEVICES** described in Attachment A-1;

e.  evidence of the times the **TARGET DEVICES** described in Attachment A-1 was used;

f.  passwords, encryption keys, and other access devices that may be necessary to access the **TARGET DEVICES** described in Attachment A-1;

g.  documentation and manuals that may be necessary to access the **TARGET DEVICES** described in Attachment A-1 or to conduct a forensic examination of each device described in Attachment A-1; and

h. contextual information necessary to understand the evidence described in this attachment.

4. As used above, the terms "records, documents, messages, correspondence, data, and materials" includes records, documents, messages, correspondence, data, and materials, created, modified or stored in any form, including electronic or digital form, and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

5. With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software, or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

a. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

b. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

c. "scanning" storage areas to discover and possible recover recently deleted files;

d. "scanning" storage areas for deliberately hidden files; or

e. performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

6. If after performing these procedures, the directories, files, or storage areas do not reveal evidence of child pornography or other criminal activity, the further search of that particular directory, file, or storage area shall cease.

7. With respect to the search of the information seized pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of

information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the Court. The investigative team may continue to review any information not segregated as potentially privileged.

**ATTACHMENT B-2**

**Particular Things to be Seized**

**I.   Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A-2, A-3, and A-4 are within the possession, custody, or control of the **SERVICE PROVIDERS**, including any information that has been deleted but is still available to the **SERVICE PROVIDERS** or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the **SERVICE PROVIDERS** is required to disclose to the government the following information pertaining to the **SUBJECT TELEPHONES** listed in Attachment A-2, A-3, and A-4 for the time period of April 1, 2024 and July 5, 2024.

The following information about the customers or subscribers associated with the **SUBJECT TELEPHONES** for the aforementioned time periods:

a.   The following information about the customers or subscribers of the Account:

    i.   Names (including subscriber names, user names, and screen names);

    ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii.   Local and long distance telephone connection records;

    iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v.   Length of service (including start date) and types of service utilized;

    vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.      Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii.     Means and source of payment for such service (including any credit card or bank account number) and billing records.

b.    All records and other information (not including the contents of communications) for the identified date range relating to wire and electronic communications sent or received by the including:

i.      the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

ii.     information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received (If provider is Verizon), as well as per-call measurement data (also known as "real-time tool" or "RTT")].

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. §1951(a) (Conspiracy to Commit Hobbs Act Robbery), 18 U.S.C. §1951(a) (Hobbs Act Robbery), 18 U.S.C. § 922(g) (Unlawful Possession of a Firearm by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year), and 18 U.S.C. § 924(c) (Use of a firearm during a crime of violence) ("**TARGET OFFENSES**").

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.

**ATTACHMENT B-3**

**Property to be Seized from KEVIN MARCELL BUSHROD**

The following items constituting evidence of violations of 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year), § 1951(a) (Hobbs Act Robbery), 18 U.S.C. § 1951(a) (Conspiracy to Commit Hobbs Act Robbery), and 18 U.S.C. § 924(c) (Using, Carrying, and Brandishing a Firearm During and in Relation to a Crime of Violence)("**TARGET OFFENSES**"), by Kevin Marcell **BUSHROD**, as described in the search warrant affidavit:

   a. A sample of the deoxyribonucleic acid ("DNA") of the person identified in Attachment A-5 to be collected via buccal or oral swabs in accordance with established procedures, and to be analyzed forensically in accordance with the applicable, valid established procedures.